## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

ATHENEX, INC.
1001 Main Street, Suite 600
Buffalo, NY 14203

ATHENEX PHARMA SOLUTIONS, LLC
11342 Main Street,
Clarence, NY 14031

ATHENEX PHARMACEUTICAL
DIVISION, LLC
10 N. Martingale Road, Suite 230
Schaumburg, IL 60173,

        Plaintiffs,

   v.

ALEX M. AZAR II, Secretary of Health and
Human Services
200 Independence Avenue, SW
Washington, DC 20201;

U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES,
200 Independence Avenue, SW
Washington, DC 20201;

SCOTT GOTTLIEB, Commissioner of Food
and Drugs
10903 New Hampshire Avenue
Silver Spring, MD 20993; and

U.S. FOOD AND DRUG
ADMINISTRATION,
10903 New Hampshire Avenue
Silver Spring, MD 20993,

        Defendants.

Civil Action No.:

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs Athenex, Inc., Athenex Pharma Solutions, LLC, and Athenex Pharmaceutical Division, LLC (collectively, "Athenex") seek declaratory and injunctive relief against Defendants Alex M. Azar II, Scott Gottlieb, the U.S. Department of Health and Human Services ("HHS"), and the U.S. Food and Drug Administration ("FDA") (collectively, "Defendants") for violations of the Administrative Procedure Act ("APA") and the Federal Food, Drug, and Cosmetic Act ("FFDCA").  In support thereof, Athenex states the following:

## INTRODUCTION

1.      Athenex seeks preliminary and permanent injunctive relief vacating FDA's decision to exclude the bulk drug substance vasopressin from the list of bulk drug substances "for which there is a clinical need," which FDA is required to publish pursuant to 21 U.S.C. § 353b(a)(2)(A)(i) (the "503B Bulks List").  FDA's decision was published in the Federal Register on March 4, 2019, List of Bulk Drug Substances for Which There Is a Clinical Need Under Section 503B of the Federal Food, Drug, and Cosmetic Act, 84 Fed. Reg. 7,383 (Mar. 4, 2019) (hereinafter, FDA's "Vasopressin Decision").

2.      Athenex is a start-up, clinical-phase biopharmaceutical company working to develop and eventually launch FDA-approved, branded pharmaceutical products for the treatment of cancer.  In pursuit of that goal, Athenex generates revenue by operating an FDA-registered 503B outsourcing facility, which compounds sterile drug products for healthcare providers.  Athenex's outsourcing facility is one of only about 73 registered 503B facilities nationwide.  Athenex's vasopressin product is by far the most significant drug product produced at its outsourcing facility.  If FDA's Vasopressin Decision is allowed to stand, Athenex will be unable to provide its compounded vasopressin product to healthcare providers.

3.      Vasopressin is a polypeptide hormone that contracts vascular and other smooth

muscles.  It is produced naturally by the human body.  It is also a life-saving drug substance that has been prescribed for nearly a century to treat serious, life-threating and emergency conditions including vasodilatory shock, diabetes insipidus, and gastrointestinal bleeding.  FDA has found that vasopressin is safe and effective for patient treatment.  Yet, despite the clear clinical need for vasopressin, FDA's Vasopressin Decision *excluded* vasopressin from the list of substances for which there is a clinical need.

4.  FDA's Vasopressin Decision is contrary to the FFDCA, which permits compounding of a bulk drug substance when "the bulk drug substance appears on a list established by the Secretary identifying bulk drug substances for which there is a clinical need," 21 U.S.C. § 353b(a)(2)(A)(i), and certain other requirements are met.  Violating the plain language of the statute, FDA applied a different standard for the 503B Bulks List than Congress directed.  Rather than determine whether vasopressin is a bulk drug substance for which there is a clinical need—which must be the case because vasopressin is already used in an FDA-approved drug product—FDA instead determined whether there is a clinical need for a compounded vasopressin drug product produced from the bulk drug substance that cannot be met by a suitable FDA-approved drug product.  Applying that unlawful standard, FDA excluded vasopressin from the 503B Bulks List based on its determination that a suitable FDA-approved drug product meets all the clinical needs that a compounded vasopressin drug product would address.  In so doing, FDA read out of the statute Congress's plain-language instruction to list bulk drug *substances* for which there is a clinical need.  FDA's misreading of the statute also is inconsistent with the structure and context of the law, rendering other key subparts of Section 503B superfluous.  Further, FDA's reading disturbs the careful balance Congress struck and intrudes on the states' traditional province over the practice of medicine.

5.      In addition to adopting a standard that is contrary to law, FDA applied that unlawful standard to vasopressin in a manner that was arbitrary and capricious because, even accepting for the sake of argument that FDA's reading of the statute's clinical need requirement was lawful (which it is not), vasopressin *meets* FDA's stated criteria for inclusion on the 503B Bulks List and should have been included on the Bulks List on that basis.  FDA acknowledges that the presence of an allergen in a branded drug product shows there is a clinical need for a compounded drug product that does not contain that allergen.  This is the case here.  The only branded version of vasopressin is a product called Vasostrict®, which is contraindicated for patients with an allergy or hypersensitivity to chlorobutanol.  Athenex's compounded product, by contrast, is produced without chlorobutanol, thus meeting one of FDA's stated rationales for including a bulk drug substance on the Bulks List.  In addition, Athenex's vasopressin product is in ready-to-use form, which also meets clinical needs that are unmet by the branded vasopressin product.  Athenex has spent significant resources developing and bringing to market a vasopressin product in a form that is ready-to-use and free of a preservative (i.e., chlorobutanol) to which some patients are allergic.  These two attributes—ready-to-use and chlorobutanol-free—meet important clinical needs, rendering FDA's decision to exclude vasopressin arbitrary and capricious even under FDA's unlawful standard for the 503B Bulks List.

6.      Absent immediate preliminary and permanent injunctive relief Athenex will be unable to sell its vasopressin product, which will cause it irreparable harm from the loss of revenue, customers, and other business, as more fully described in Athenex's motion for a temporary restraining order and a preliminary injunction filed contemporaneously with this Complaint.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action and personal

4

jurisdiction over the parties pursuant to 28 U.S.C. § 1331, 28 U.S.C. §§ 2201, 2202, and 5 U.S.C. §§ 704-706, as this action presents a case and controversy under the FFDCA, the APA, and the Declaratory Judgment Act, 28 U.S.C. § 2201.

8.      Venue lies in this district under 28 U.S.C. § 1391 in that Defendants Azar and Gottlieb are officers and employees of a United States agency, Defendants reside in the District of Columbia, a substantial part of the events giving rise to this claim occurred in the District of Columbia, Plaintiffs reside in New York, and no real property is involved in the action.  Venue also lies in this district under 5 U.S.C. § 703 because there is no special statutory procedure for appeal and this court is a court of competent jurisdiction.

## THE PARTIES

9.      Plaintiff Athenex, Inc. is a Delaware corporation with its principal place of business at 1001 Main Street, Suite 600, Buffalo, New York 14203.

10.     Plaintiff Athenex Pharma Solutions, LLC is a limited liability company organized under the laws of Delaware with its principal place of business at 11342 Main Street, Clarence, New York 14031 and an office at 1001 Main Street, Suite 600, Buffalo, New York 14203.

11.     Plaintiff Athenex Pharmaceutical Division, LLC is a limited liability company organized under the laws of Delaware with its principal place of business at 10 N. Martingale Road, Suite 230, Schaumburg, Illinois 60173 and an office at 1001 Main Street, Suite 600, Buffalo, New York 14203.

12.     Defendant Alex M. Azar II is the United States Secretary of Health and Human Services ("HHS").  Defendant Azar, by and through his designees at HHS, undertook the illegal and  unauthorized actions challenged in this case and has withheld the administrative action plaintiffs   have requested to be taken.  His governmental activities occur in this District and

nationwide.  Defendant Azar is sued solely in his official capacity.

13.     Defendant Scott Gottlieb is the Commissioner of the U.S. Food and Drug

Administration ("FDA").  FDA is the agency that administers the programs under FFDCA.

Defendant Gottlieb, by and through his designees at FDA, undertook the illegal and  unauthorized

actions challenged in this case and has withheld the administrative action plaintiffs   have

requested to be taken.  His governmental activities occur in this District and nationwide.

Defendant Gottlieb is sued  solely in his official capacity.

14.     Defendant HHS is a department of the United States.  Its headquarters and

principal place of business are at 200 Independence Avenue, S.W., Washington, D.C. 20201.  Its

governmental activities occur in this District and nationwide.

15.     Defendant FDA is an agency of the United States and a division of HHS.  FDA's

headquarters and principal place of business are at 10903 New Hampshire Avenue, Silver

Spring, MD 20993.  Its governmental activities occur in this District and nationwide.  FDA is the

federal agency in charge of administering the FFDCA.

## STATUTORY AND REGULATORY FRAMEWORK

16.     Compounding is the act of combining, admixing, mixing, diluting, pooling,

reconstituting, or otherwise altering of a drug or bulk drug substance to create a drug.  21 U.S.C.

§ 353b(d)(1).  Outsourcing facilities compound sterile drug products for hospitals, clinics, or

healthcare practitioners to keep on hand as "office stock" for patients who present with an

immediate need for them.

17.     In 2013, Congress enacted the Drug Quality and Security Act ("DQSA") to

strike a balance between the importance of bulk drug compounding to our healthcare system and

the need for stringent controls to address the legacy of unregulated and unsafe compounding

practices culminating in a 2012 outbreak of fungal meningitis.

18.     Congress recognized that "[w]ithout compounders, doctors would not perform surgeries.  Without compounders, oncologists would be forced to administer alternative chemotherapy drugs.  Without compounders, patients would suffer from limited access."  159 Cong. Rec. S8071-04 (daily ed. Nov. 18, 2013) (statement of Sen. Boozman).

19.     Among other things, the DQSA added the Compounding Quality Act to the FFDCA.  Drug Quality and Security Act, Pub. L. No. 113-54, 127 Stat. 587 (2013).  The Compounding Quality Act imposed new limits on the practice of compounding sterile human drugs and ensures that patients and providers have access to safe, compounded drugs.

20.     Section 503B of the Compounding Quality Act imposed comprehensive requirements for regulated outsourcing facilities, including registration with FDA, labeling, rigorous controls and quality standards, adverse incident reporting, and FDA inspections.  21 U.S.C. § 353b(b).

21.     Under Section 503B, an outsourcing facility may compound a drug from a "bulk drug substance" without going through the new drug application process but only if it registers with FDA and complies with the requirements of Section 503B.  21 U.S.C. §§ 353b(a) and 353b(d)(4)(A).

22.     FDA has defined "bulk drug substance" as follows: "Bulk drug substance, as referenced in sections 503A(b)(1)(A) and 503B(a)(2) of the Federal Food, Drug, and Cosmetic Act, means the same as 'active pharmaceutical ingredient' as defined in § 207.1(b)."  21 C.F.R. § 207.3; *id.* at § 207.1.

23.     FDA has defined the term "active pharmaceutical ingredient" as follows:

*Active pharmaceutical ingredient* means any substance that is intended for incorporation into a finished drug product and is intended to furnish pharmacological activity or other direct effect in the diagnosis, cure, mitigation, treatment, or prevention of disease, or to affect the structure or any function of the

body.  Active pharmaceutical ingredient does not include intermediates used in the synthesis of the substance.

21 C.F.R. § 207.1.  Thus, a bulk drug substance is an active pharmaceutical ingredient.

      24.     Vasopressin is a bulk drug substance.

      25.     Through Section 503B, Congress provided that "outsourcing facilities" may manufacture sterile compounded drug products using bulk drug substances when:

> (A)(i) the bulk drug substance appears on a list established by the Secretary identifying bulk drug substances for which there is a clinical need, by –
>> (I) publishing a notice in the Federal Register proposing bulk drug substances to be included on the list, including the rationale for such a proposal;
>> (II) providing a period of not less than 60 calendar days for comment on the notice; and
>> (III) publishing a notice in the Federal Register designating bulk drug substances for inclusion on the list

21 U.S.C. § 353b(a)(2)(A)(i).

      26.     The "list established by the Secretary identifying bulk drug substances for which there is a clinical need"—i.e., the 503B Bulks List—is currently under development by FDA.

      27.     After two attempts to obtain nominations for bulk drug substances that FDA concluded resulted in overbroad nominations, in October 2015, FDA opened a new docket to allow nominations of bulk drug substances to the 503B Bulks List and that docket remains open. *Id*. at 8; 80 Fed. Reg. 65770 (Oct. 27, 2015).  In two, independent 2017 submissions to the FDA, vasopressin was nominated for inclusion on the 503B Bulks List.  In response, FDA determined that vasopressin was one of only about 300 substances that may be eligible for inclusion on the 503B Bulks List, were nominated with sufficient support, and did not pose significant safety risks in compounding.  As a result, vasopressin was included on a January 2017 "Category 1" List of Substances Nominated for the Bulks List Currently under Evaluation.

      28.     To allow for further evaluation of the nominated bulk drug substances "on a

rolling basis," FDA published the Interim Policy[1] to articulate its enforcement discretion in a

way that "avoid[ed] unnecessary disruption to patient treatment," by not taking enforcement

against outsourcing facilities that were compounding from a Category 1 bulk substance and

complied with substantive requirements of the policy. Interim Policy at 6-7.

29.     In an August 28, 2018 Federal Register notice, FDA opened a 60-day notice and

comment rulemaking period on its proposal to exclude vasopressin from the 503B Bulks List

based on the information currently before the agency.  *See* FDA, List of Bulk Substances for

Which There is a Clinical Need Under Section 503B of the Federal Food, Drug, and Cosmetic

Act, 83 Fed. Reg. 43877-82, (Aug. 28, 2018).

30.     On October 29, 2018, Athenex submitted comments in response to FDA's

August 28, 2018 Federal Register notice.  Athenex stated that FDA's proposal to exclude

vasopressin from the 503B Bulks List is based on a misreading of the statute, conflicts with the

statute, and disturbs the balance Congress struck between the competing interests of encouraging

the use of the new drug approval process and also encouraging drug compounding.  Athenex

stated, *inter alia*, that vasopressin qualifies for the 503B Bulks List because it is a "bulk drug

substance[] for which there is a clinical need," 21 U.S.C. § 353b(a)(2)(A)(i), given that the

clinical need for vasopressin is well documented: vasopressin has been used for decades to treat

vasodilatory shock and has been approved by FDA for that use.

31.     Athenex also explained that even under FDA's misreading of the statute,

vasopressin would still qualify for inclusion on the 503B Bulks List because Athenex's

---

[1] *See* FDA, *Bulk Drug Substances Nominated for Use in Compounding Under Section 503B of the Federal Food, Drug, and Cosmetic Act, 503B Category 1 – Bulk Drug Substances Under Evaluation* (July 2018),
https://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Pharmacy Compounding/UCM467374.pdf (last visited August 28, 2018).

vasopressin drug product satisfies two clinical needs that Vasostrict® does not meet and which can only be met appropriately by compounding from a bulk drug substance: (1) Athenex's vasopressin product does not contain a preservative called chlorobutanol; and (2) Athenex's vasopressin product is sold for office stock in ready-to-use form, which provides many clinical benefits that are well-documented by the medical community.

32.     FDA placed on the docket approximately 30 comments regarding its proposal, including comments supporting the inclusion of vasopressin on the 503B Bulks List.  Among them is a comment from Athenex dated November 9, 2018, which addressed the October 29, 2018 comments submitted by Endo International plc and PharMEDium Services, LLC regarding FDA's proposal and setting forth additional reasons why FDA should include vasopressin on the 503B Bulks List.  Athenex's public comment submissions included the medical literature and other such sources referenced in this Complaint so they, too, are part of the administrative record.

## FDA'S VASOPRESSIN DECISION

33.     On March 4, 2019, FDA rendered its final rule regarding vasopressin's inclusion on the 503B Bulks List.  84 Fed. Reg. 7,383.  FDA excluded vasopressin from the 503B Bulks List, stating that "we find no clinical need for an outsourcing facility to compound using the bulk drug substance[] … vasopressin and, therefore, we are not including … vasopressin on the 503B Bulks List."  As a result of FDA's Vasopressin Decision, FDA also removed vasopressin from the 503B Category 1 List because vasopressin was no longer being evaluated for the 503B Bulks List.

34.     FDA based its Vasopressin Decision on two findings: (1) "with respect to the vasopressin drug products proposed to be compounded, FDA finds no basis to conclude that an

attribute of VASOSTRICT makes it medically unsuitable to treat certain patients," and (2) "FDA finds no basis to conclude that drug products must be compounded using a bulk drug substance rather than the approved drug product."

35.     The Vasopressin Decision constitutes final agency action as it is the culmination of FDA's decision-making process as to vasopressin's inclusion on the 503B Bulks List and in that regard, it determines legal rights and creates legal obligations.

### ATHENEX IS A REGISTERED 503B OUTSOURCING FACILITY

36.     Athenex, Inc. is a start-up, clinical-phase biopharmaceutical company headquartered in Buffalo, New York.  Its mission is to improve the lives of patients by creating more effective, safer and tolerable treatments.  Athenex is working to develop and eventually launch FDA-approved, branded pharmaceutical products for the treatment of cancer.  Athenex, Inc. and its subsidiaries employ approximately 500 people in seven offices, globally.

37.     While working toward the goal of launching an FDA-approved drug for treatment of cancer and to fund the continued development of Athenex's pipeline of potential cancer therapies, Athenex, Inc. has derived revenue from the sale of other products, including its ready-to-use, chlorobutanol-free, vasopressin drug product.

38.     Athenex's laboratory and manufacturing facility in Clarence, New York operates in accordance with FDA's stringent cGMP manufacturing regulations set forth in 21 C.F.R. Parts 210 and 211.  cGMP is the same standard by which FDA-branded drugs, like Vasostrict®, are produced.

39.     On April 10, 2017, Athenex registered with FDA as a 503B facility and launched its bulk compounding operation with the same attention to detail and safety standards as a facility manufacturing FDA-branded drugs.  It is one of only about 73 registered 503B facilities nationwide.  Athenex's manufacturing process has been inspected by FDA in connection with

the 503B registration and Athenex's facility meets all criteria for a facility to engage in 503B compounding.

40.     Athenex has included large scale 503B manufacturing in its long-term business plan to generate revenue and help fund its development of FDA-branded cancer treatments. Athenex made this business decision in reliance on the Interim Policy, in which FDA stated that it plans to forego enforcement against facilities that compound from bulk using drug substances identified as "Category 1" substances on FDA's list of bulk drug substances under evaluation pursuant to Section 503B.

41.     Applying its business judgment that the FDA would not attempt to block a vasopressin compounding business because of the Interim Policy, Athenex made significant investments needed to run a high-quality 503B operation, which prioritizes safety and state-of-the-art manufacturing processes.  FDA's inclusion of vasopressin on the Category 1 List, in connection with the Interim Policy, gave Athenex a sound business basis to develop a compounded vasopressin drug product.

42.     Athenex has invested over $2 million to renovate the Clarence, New York facility's aseptic operations space, to accommodate a cGMP-compliant operation compounding drugs from bulk substances under 503B.  The facility currently has approximately 50 employees engaged in 503B compounding.  Athenex is making additional improvements to the Clarence facility, including an expansion of the facility, which will accommodate more personnel as the operation grows.

43.     Athenex's marketing and commercialization team invested significant time and resources researching the viability of vasopressin as a compounded product, including the market need for a ready-to-use product, market research on product needs, and labeling and packaging

development procedures.

44.     Athenex launched its vasopressin product in August 2018.

**ATHENEX COMPOUNDS INTRAVENOUS VASOPRESSIN FROM BULK**

45.     Vasopressin is a polypeptide hormone that contracts vascular and other smooth muscles.  Vasopressin drug products are used to increase blood pressure in adults with vasodilatory shock (e.g., post-cardiotomy or sepsis) who remain hypotensive, despite fluids and catecholamines.

46.     Vasopressin drug products are commonly used in emergency situations, such as in emergency rooms, intensive care units, the cardiac catheter laboratory, on crash carts, for code cases on the hospital floor, and in other sensitive hospital settings.  Athenex' vasopressin drug product is a lifesaving infusion used to ensure adequate blood delivery to patients' vital organs, used after other drugs have failed and the patient is at risk of organ failure.

47.     The clinical need for the bulk drug substance vasopressin is well-established: it has been used effectively for more than a century to treat vasodilatory shock and in 2014, FDA approved a vasopressin drug product for that use.  Prior to 2014, vasopressin products were commonly used, unapproved marketed drugs that were often compounded by pharmacists.

48.     In 2000, the American Heart Association declared that vasopressin:

> may be a more effective pressor agent than epinephrine for promoting the return of spontaneous circulation in cardiac arrest.  The evidence from prospective clinical trials in humans is limited but consistently positive (Class 11b).  Vasopressin (40 U IV, not repeated) may be substituted for epinephrine as an alternative Class 11b agent.  The lower adverse effects profile may be the major indication for vasopressin.

*Part 6: Advanced Cardiovascular Life Support, section 1: Introduction to ACLS 2000: Overview of Recommended Changes in ACLS From the Guidelines 2000 Conference*, 102 CIRCULATION 1-86-89 (2018).

49.     In 2014, FDA approved a drug called Vasostrict®, which is the only branded

version of an intravenous vasopressin drug product.  Vasostrict® is produced and sold by Par

Sterile Products, LLC and Endo Par Innovation Company, LLC (collectively, "Par").  In its

application for Vasostrict® to FDA, Par only relied upon a review of then published literature to

characterize the pharmacology, safety and efficacy of its drug.  No new nonclinical

pharmacology, toxicology, or human studies supported Par's regulatory approval.

50.     Vasostrict® is contraindicated in patients with an allergy or hypersensitivity to

chlorobutanol, which is a preservative found in Vasostrict®.  People with hypersensitivity to

chlorobutanol can suffer adverse reactions if exposed to chlorobutanol, including cardiovascular

effects, neurological effects, and other reactions.  The package insert for both vial sizes of

Vasostrict® (i.e., 1mL and 10mL vials) states that the Vasostrict® products are "contraindicated

in patients with known allergy or hypersensitivity to 8-L-arginine vasopressin or chlorobutanol."

51.     Vasostrict® is not manufactured in ready-to-use form.  Athenex's vasopressin

product is a ready-to-use drug product.  Once Vasostrict® has been diluted and prepared for use,

it has a limited shelf-life of 18-24 hours, depending on refrigeration.  Thus, instead of keeping

pre-mixed versions in crash carts, the drug often must be ordered from the pharmacy, after the

emergent need for it has already arisen.  The aseptic steps to admix the solution are numerous

and can take more than 5-7 minutes to complete, even in a best-case scenario.  If the patient is

given the wrong dose of Vasostrict®, or if the aseptic steps are not effectively performed while

admixing the drug during an emergency scenario, serious medical complications could arise that

may lead to death.

52.     In a 2016 guidance document, FDA stated that a drug that is not in ready-to-use

form takes longer to administer and poses a heightened risk of human error and contamination in

its preparation and administration, as compared to a drug that is manufactured and sold in ready-

to-use form.  *See* U.S. FOOD & DRUG ADMIN., SAFETY CONSIDERATIONS FOR PRODUCT DESIGN

TO MINIMIZE MEDICATION ERRORS: GUIDANCE FOR INDUSTRY (2016).

53.     The Institute for Safe Medication Practices ("ISMP") identified vasopressin as

one of 12 "specific medications" on its 2018 "List of High-Alert Medications in Acute Care

Settings."  *See High-Alert Medications in Acute Care Settings*, ISMP RECOMMENDATIONS (Aug.

23, 2018), https://www.ismp.org/recommendations/high-alert-medications-acute-list.  ISMP

defines "high-alert medications" as "drugs that bear a heightened risk of causing significant

patient harm when they are used in error."  *Id.*  ISMP further stated that "[a]lthough mistakes

may or may not be more common with these drugs, the consequences of an error are clearly

more devasting to patients."  *Id.*  Even small concentration changes can significantly increase the

risk.

## ATHENEX'S VASOPRESSIN PRODUCT MEETS CLINICAL NEEDS

54.     FDA's standard for inclusion on the 503B Bulks List is contrary to law.  FDA's

reading of the phrase "list established by the Secretary identifying bulk drug substances for

which there is a clinical need," 21 U.S.C. § 353b(a)(2)(A)(i), contradicts the plain language of

the statute.  FDA interpreted the phrase to require a clinical need for an outsourcing facility to

compound a *product* from that bulk drug substance, rather than a clinical need for the bulk drug

substance, as the statute unambiguously directs.  Here, the bulk drug substance – i.e., the active

pharmaceutical ingredient – is vasopressin.  The clinical need for vasopressin is well established,

as demonstrated by, among other things, the fact that FDA has approved a drug product that

contains vasopressin as its active pharmaceutical ingredient (i.e., Vasostrict®).

55.     But even under FDA's unlawful standard for the 503B Bulks List, FDA's

decision to exclude vasopressin from the 503B Bulks List is arbitrary and capricious because

Athenex's compounded vasopressin product provides at least two attributes that Vasostrict®

lacks and that satisfy clinical needs.

### A. Athenex's Product Meets The Clinical Need For Chlorobutanol-Free Vasopressin

56.     There is a clinical need, previously unmet, for intravenous vasopressin drug product produced without chlorobutanol.

57.     Athenex formulated its vasopressin product to be chlorobutanol-free, which serves the needs of patients with an allergy or hypersensitivity to chlorobutanol.  Athenex can create a chlorobutanol-free vasopressin product because it compounds the drug product from the sterile bulk drug substance, vasopressin, which does not contain chlorobutanol and no chlorobutanol is added during the compounding process.

58.     By contrast, Vasostrict® is contraindicated in patients with an allergy or hypersensitivity to chlorobutanol per the FDA-approved label for both the product's approved vial sizes (i.e., 1mL and 10mL vials).

59.     Under FDA regulations, a product's label must describe any situations in which the drug should not be used because the risk of use (e.g., certain potentially fatal adverse reactions) clearly outweighs any possible therapeutic benefit.  21 C.F.R. § 201.57(c)(5).  And FDA regulations mandate that known hazards and not theoretical possibilities be listed (e.g., if severe hypersensitivity to the drug has not been demonstrated, it should not be listed as a contraindication).  *Id*.  FDA's guidance also explains that the "WARNINGS AND PRECAUTIONS" section of the label "is intended to identify and describe a discrete set of adverse reactions and other potential safety hazards that are serious or are otherwise clinically significant because they have implications for prescribing decisions or for patient management."

60.     The risks associated with chlorobutanol for a patient with a chlorobutanol sensitivity are substantiated by numerous scientific publications and include such serious adverse

reactions as anaphylactic shock.  Other adverse reactions reported in the Handbook of

Pharmaceutical Excipients (8th edition) include "cardiovascular effects following intravenous

administration of heparin sodium injection preserved with chlorobutanol, neurological effects

following administration of a large dose of morphine infusion preserved with chlorobutanol, and

hypersensitivity reactions."  Paul J. Sheskey, Walter G. Cook, and Colin G. Cable, HANDBOOK

OF PHARMACEUTICAL EXCIPIENTS 234 (Pharma. Press, 8th revised ed. 2017).  Other documented

adverse reactions include irritation, susceptibility to infection, hypersensitivity, and anaphylaxis.

61.     Besides the risks relating to chlorobutanol allergies and hypersensitivities

generally, there are also concerns with chlorobutanol and pregnancy.  Some medical scholars

have observed that chlorobutanol used in parenteral preparations can produce human

embryotoxicity.  Others have observed that systematic preparations containing chlorobutanol

should be used with caution and repeated administration should be avoided.

**B.  Athenex's Product Meets the Clinical Need for a Ready-to-Use Vasopressin Product**

62.     There is also a clinical need, previously unmet, for intravenous vasopressin drug

product produced in a ready-to-use format.  Vasostrict® is not manufactured in ready-to-use

form and must be mixed before administering the drug to the patient.  The mixing is often done

after the emergent need for the drug arises.

63.     Athenex's vasopressin product is a ready-to-use drug.  It is supplied in IV-bags

that do not require further dilution.  Athenex's compounded vasopressin does not require

refrigeration and has a shelf-life of 60 days.

64.     The ready-to-use attribute of Athenex's compounded vasopressin product meets

important clinical needs by reducing the wait-time associated with mixing and diluting the IV-

bag and minimizing opportunities for human error or contamination in preparation and

administration.

65.     Athenex's product is faster to administer than Vasostrict® because it is produced and stored in ready-to-use form, so it does not require any dilution or mixing and can be kept for longer period of time in the unit where patients will need it.

66.     By contrast, the aseptic steps to admix the Vasostrict® solution are numerous and can take more than 5-7 minutes to complete, even in a best-case scenario.

67.     Athenex's product also poses less risk for human error or contamination because, instead of the multi-step process required to prepare and administer Vasostrict®, Athenex's product is administered to patients by selecting the proper dosage (by referencing the easy-to-read label that is applied on each side of every bag during the manufacturing process) and connecting the bag to the patient's IV-line.

68.     The clinical needs met by ready-to-use drugs (sometimes known as unit dose products) have long been recognized by pharmacy associations, patient safety organizations, governmental agencies, and accrediting bodies.  Some examples of these organizations that have policies on the preferred use of ready-to-use or unit does products are ISMP, the American Pharmacist Association ("APhA"), the American Society of Hospital Pharmacists ("ASHP"), FDA, the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO"), and others.

69.     ASHP's Guidelines on Preventing Medication Errors in Hospitals state that:

> [w]henever possible, medications should be available for inpatient use in unit-of-use and ready to administer packaging without further manipulation by the person administering the medication.  Every effort should be made to reduce situations where the person administering the medication has to withdraw doses from containers, reconstitute powered drug products, split tablets, or perform other similar manipulations.

American Society of Hospital-System Pharmacists, *ASHP Guidelines for Preventing Medication*

*Errors in Hospital* 268, 290 (2018).

70.     The APhA states in its Policy Manual Drug Product Packaging that ready-to-use or unit-of-use packaging should be adopted "to enhance patient safety, patient adherence, and efficiencies in drug distribution, and to reduce potential for counterfeiting."  American Pharmacist Association, APhA Policy Manual Drug Product Packaging (2012).

71.     A number of medical studies have found that medications in ready-to-use form reduce time and errors.  The American Journal of Health System Pharmacists found that U.S. hospitals received multiple advantages from using ready-to-use parenteral products, including, enhanced safety benefits, increased dispensing efficiency, cost avoidance due to reduced waste, and improved compliance with federal and state regulations.  *See* John Fanikos, Abbie Erickson, Dristin E. Munz, et. al., *Observations on the use of ready-to-use and point-of-care activated parenteral products in automated dispensing cabinets in U.S. hospitals*, 64 Am. J. Health-Syst. Pharm. 2037, 2042 (2007).

72.     The Centers for Medicare and Medicaid Services ("CMS"), a division of Defendant HHS, stated in a 2008 Federal Register Notice that

> [t]he use of [ready-to-use] drugs or drug classes often results in an earlier hospital discharge and reduced health care costs, and rapid access to these agents is imperative to these health care transitions.  It is our expectation that Part D sponsors will not implement policies that could potentially delay or restrict beneficiary access to these important agents.

73 Fed. Reg. 20486, 20496 (Apr. 15, 2008).

73.     CMS has also stated that "unit dose packaging [is] used to help avoid medication errors and maintain the integrity of the medication, thereby enhancing the nursing facility's ability to meet its regulatory obligation to provide safe and effective distribution of drugs."  The Lewin Group, *CMS Review of Current Standards of Practice for Long-Term Care Pharmacy*

*Services* 1, 2 (2004).  CMS stated that the standards of practice "have evolved to emphasize the unit of dose systems, particularly in institutional settings."  *Id.*  CMS's Medicare Part D Manual states that "it is CMS's expectation that sponsors provide coverage of dosage forms of drugs that are widely utilized in the LTC setting, such as unit does products and liquid, chewable, and parenteral preparations."  CENTERS FOR MEDICARE AND MEDICAID SERVICES, MEDICARE PRESCRIPTION DRUG BENEFIT MANUAL 30.2.3 (revised Jan. 15, 2016).

74.     JCAHO standards MM.03.01.03 and MM.05.01.11 state that hospital pharmacies should ensure, whenever possible, that emergency medications are available in unit-dose, age-specific, and ready-to-administer forms.  *See* Joint Commission Standard MM.03.01.03.  And that medications are dispensed in the most ready-to-administer forms.  *See* Joint Commission Standard MM.05.01.11.

75.     Defendant FDA has also expressed a preference for ready-to-use products.  In a 2016 guidance, FDA stated "[p]roducts should be designed so that foreseeable end users can perform critical tasks using the drug product-user interface without making unintentional medication errors and without being exposed to unnecessary safety hazards."  *See* U.S. FOOD & DRUG ADMIN., SAFETY CONSIDERATIONS FOR PRODUCT DESIGN TO MINIMIZE MEDICATION ERRORS: GUIDANCE FOR INDUSTRY 6 (2016).

76.     FDA also stated that the industry should:

[t]o the extent possible, avoid developing intravenous products already in solution that require a two-step dilution prior to administration.  Users might fail to dilute such products because they are already in solution or they might dilute them incorrectly, leading to medication dosing and administration errors.

*Id.* at 12.  This expresses FDA's recognition of a clinical need for ready-to-use intravenous products.  FDA also stated that products, such as Vasostrict®, "that require further dilution prior to administration should not be packaged in containers that could afford direct administration."

*Id*. at 14.  FDA's compliance policy also supports the advantages of Athenex's compounded

vasopressin product: "The advantages of unit does dispensing are that the drug is fully

identifiable and the integrity of the dosage form is protected until the actual moment of

administration."  FDA Compliance Policy Sec. 430.100.

77.     Meeting these clinical needs are critically important when treating emergency

cardiac events, where every minute matters and dosing errors or contamination can be

catastrophic.  FDA's conclusion to the contrary is arbitrary and capricious.

78.     The Vasopressin Decision improperly ignores these vital clinical needs and

draws a conclusion that lacks support from the record evidence and should be vacated as

arbitrary and capricious.

## COMPOUNDING VASOPRESSIN FROM BULK IS SAFER THAN STERILE-TO-STERILE

79.     FDA's Vasopressin Decision states that "when it is feasible to compound a drug

product by starting with an approved drug product, there are certain benefits of doing so over

starting with a bulk drug substance, including benefits relating to the assurances associated with

premarket review by FDA for safety, effectiveness, and quality."

80.     FDA's conclusion that compounding from bulk drug substances is not as safe as

compounding from sterile-to-sterile is incorrect and will lead to lower quality compounded drugs

and leave patient populations without appropriate medical treatment.

81.     In general, compounding from an FDA-approved drug is more complicated than

compounding from bulk, involves more steps, and presents more risks because at each step or

manipulation of the drug, there is a risk of contamination or error.

82.     FDA's own draft guidance and statements from Defendant FDA Commissioner,

Dr. Gottlieb advocate for fewer manipulations in the act of compounding.  For example, FDA's

recent guidance states that, as part of current good manufacturing practice in drug compounding:

> In general, processes and procedures at an outsourcing facility should minimize contamination risks posed by, for example, the number and complexity of manipulations, number of simultaneous operations and workstations, and staging of materials used in the process.

FDA, *Current Good Manufacturing Practice—Guidance for Human Drug Compounding Outsourcing Facilities Under Section 503B of the FD&C Act*, Draft Guidance (Dec. 2018) ("FDA's CGMP Guidance"), at 8. And on December 10, 2018, Defendant Gottlieb issued a statement reiterating that FDA is focused on the importance of ensuring compounded product quality. *See FDA Statement from FDA Commissioner Scott Gottlieb, M.D. and Deputy Commissioner Anna Abram on new efforts to assure the quality of compounded drugs* (Dec. 10, 2018) ("Gottlieb Statement"). In the context of that update focused on patient safety, Dr. Gottlieb stated that:

> Our aim is to protect patients and see more of the activity that creates the greatest potential for risk be done by compounders that meet CGMP requirements rather than by those that do not. Some of these higher risk activities include compounding done on a large scale, for drugs that must be sterile, and made using many manual manipulations.

83. Likewise, FDA's scientific expert, Ian Deveau, has recognized that "microbial contamination is brought into the cleanrooms through personnel and supplies" and that "the amount of microbes brought in needs to be minimized and controlled." Ian Deveau, Ph.D., *CGMP Requirements and Outsourcing Facilities*, OUTSOURCING FACILITIES LISTENING SESSION AND BRIEFING ON DRUG COMPOUNDING, at slide 22 (Jun. 21, 2018).

84. The Gottlieb Statement and FDA's CGMP Guidance issued before the Vasopressin Decision, highlight the well-established principle that with every manipulation of a drug during the compounding process the risk of contamination and error goes up. The more manipulations, the greater the risk for contamination.

85.     Following this logic, when compounding in a cGMP environment, outsourcing facilities reduce risk by reducing the number of manipulations required to compound for office stock when they compound by using the bulk drug substance as the starting agreement as opposed to manipulating hundreds to thousands of vials of finished drug product as the starting material.

86.     FDA's Vasopressin Decision is arbitrary and capricious because it runs counter to this evidence before the agency and violates the APA on that basis.

### THE VASOPRESSIN DECISION IMMINENTLY AND IRREPARABLY HARMS ATHENEX

87.     The Vasopressin Decision will irreparably harm Athenex through lost revenue, customers, and business opportunities.  Absent immediate injunctive relief, this irreparable harm will continue to have a significant impact on Athenex.  Athenex disclosed in its 10-Q filed with the U.S. Securities and Exchange Commission on November 14, 2018, that an inability to sell vasopressin "could have a material adverse effect on the Company's businesses, results of operations, financial condition and cash flow."

### COUNT I
### Violation of 5 U.S.C. § 706(2)(C):
### Defendants Acted In Excess of Statutory Jurisdiction, Authority, or Short of Statutory Right in Issuing the Vasopressin Decision

88.     Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 87.

89.     The Vasopressin Decision is "final agency action for which there is no other adequate remedy."  5 U.S.C. § 704.

90.     The language of Section 503B(a)(2)(A)(i) unambiguously instructs FDA to include on the 503B Bulks List those "bulk drug substances for which there is a clinical need." 21 U.S.C. § 353b(a)(2)(A)(i).  This language is unambiguous: the phrase "for which there is a

clinical need" modifies the term "bulk drug substance."  The plain language of Section 503B(a)(2)(A)(i) makes clear the clinical need determination pertains to the bulk drug substance itself, not the compounded product containing that substance, as FDA's misinterpretation posits.

91.     The Vasopressin Decision is in excess of FDA's statutory jurisdiction and authority because it is contrary to Congress's unambiguous intent in enacting the DQSA—that the substances for which there is a clinical need be included on the 503B Bulks List.  21 U.S.C. § 353b(a)(2)(A)(i).  In violation of the statute's directive, FDA excluded the bulk drug substance vasopressin from the 503B Bulks List despite its being a bulk drug substance for which there is a clinical need.  FDA did so because it determined that a branded drug product made with vasopressin is suitable to address any clinical needs that would be met by a compounded drug product made with vasopressin, which is not the standard Congress directed for the 503B Bulks list.  FDA's Vasopressin Decision conflicts with this plain language, is inconsistent with the structure of Section 503B, would render superfluous Section 503B(a)(5) (addressing drugs that are essentially copies of an approved drug), disturbs the balance Congress struck between the competing interest of encouraging the use of the drug approval process and encouraging drug compounding, and intrudes on the states' traditional province over the practice of medicine.

92.     Alternatively, the Vasopressin Decision's result—that vasopressin cannot be compounded from a bulk substance because it does not meet a clinical need unmet by a branded drug product—is not a reasonable interpretation of the DQSA.

93.     The Vasopressin Decision violates Section 706(2)(C) of the APA that requires a reviewing court to "hold unlawful and set aside" agency action "in excess of statutory jurisdiction, authority, …or short of statutory right."  5 U.S.C. § 706(2)(C).

94.     The Vasopressin Decision is unlawful and should be set aside under 5 U.S.C.

§ 706(2)(C).

## COUNT II
### Violation of 5 U.S.C. § 706(2)(A):
### The Vasopressin Decision is Arbitrary, Capricious, or Otherwise Not in Accordance with Law

95.     Athenex realleges and incorporates by reference the allegations contained in Paragraphs 1 through 94.

96.     Section 706(2)(A) of the APA proscribes agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

97.     In issuing the Vasopressin Decision, FDA was required to articulate a satisfactory explanation and make a rational connection between the decision it rendered in the Vasopressin Decision and the record facts.

98.     FDA's offered explanation for its decision is that (1) "with respect to the vasopressin drug products proposed to be compounded, FDA finds no basis to conclude that an attribute of VASOSTRICT makes it medically unsuitable to treat certain patients," and (2) "FDA finds no basis to conclude that the drug products must be compounded using a bulk drug substance rather than the approved drug products." .

99.     This is counter to the record evidence and FDA's own stated decisional criteria, which demonstrates that there is a clinical need for a vasopressin product to be compounded without chlorobutanol and which demonstrates that there is a clinical need for a vasopressin product to be compounded in a ready-to-use format.

100.    FDA also concluded that compounding a vasopressin drug product from a sterile bulk drug substance is less safe than compounding a vasopressin drug product by using the branded drug as the starting material.  This is also contrary to the record evidence, which

demonstrates that compounding from a sterile bulk substance requires fewer steps and thus minimizes the potential for contamination and for human error, as compared to compounding from sterile-to-sterile, which requires more steps and requires more items to be brought into the clean room.

101.    The Vasopressin Decision is arbitrary, capricious, an abuse of discretion, and not in accordance with law.  The Final Rule should therefore be vacated pursuant to 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Athenex respectfully requests this Court enter judgment in Plaintiffs' favor, and

a) Declare that the Vasopressin Decision, insofar as it relates to the bulk drug substance vasopressin, is in excess of Defendants' statutory authority, or is short of statutory right and therefore is a violation of the APA;

b) Declare that the Vasopressin Decision, insofar as it relates to the bulk drug substance vasopressin, is arbitrary, capricious and otherwise not in accordance with law and therefore violates the APA;

c) Preliminarily enjoin the Defendants from enforcing, applying, or implementing the Vasopressin Decision, insofar as it relates to the bulk drug substance vasopressin;

d) Vacate the Vasopressin Decision, insofar as it relates to the bulk drug substance vasopressin; and

e) Grant Plaintiffs such other relief as may be necessary and appropriate or that the Court deems just and proper.

Dated:  March 4, 2019                    Respectfully submitted,

*/s/* Gilbert S. Keteltas
Gilbert S. Keteltas
D.C. Bar No. 421236
Christopher H. Marraro
D.C. Bar No. 395152
Thomas E. Hogan
D.C. Bar No. 492003

**Baker & Hostetler LLP**
Washington Square, Suite 1100
1050 Connecticut Avenue, NW
Washington, DC  20036-5304
Telephone:   (202) 861-1500
Facsimile:    (202) 861-1783
gketeltas@bakerlaw.com
cmarraro@bakerlaw.com
thogan@bakerlaw.com

Bridget S. McCabe
D.C. Bar No. 1002889
C.A. Bar No. 272545
**Baker & Hostetler LLP**
11601 Wilshire Boulevard
Suite 1400
Los Angeles, CA 90025-0509
Telephone:   (310) 442-8844
Facsimile:    (310) 820-8859
bmccabe@bakerlaw.com

*Attorneys for Plaintiffs Athenex, Inc., Athenex*
*Pharma Solutions, LLC, and Athenex*
*Pharmaceutical Division, LLC*